# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

AMERICAN NATIONAL PROPERTY and
CASUALTY CO.,

                Plaintiff/Counterdefendant,

v.                                          No. CIV 11-1137 LFG/RHS

UNITED SPECIALITY INSURANCE
CO.,

                Defendant/Counterclaimant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER[1] is before the Court on cross motions for summary judgment filed by Plaintiff American National Property and Casualty Co. ("ANPAC") and by Defendant United Specialty Insurance Co. ("United Specialty"). The cross motions are fully briefed. [Doc. Nos. 29, 30, 32, 33, 35, 37, 38, 39, 41, 43.] After careful consideration of the pertinent law, briefing, and supplemental briefing, along with all exhibits, the Court determines that ANPAC's motion for summary judgment will be denied and that United Specialty's motion for summary judgment will be granted as described below.

## Factual Background

While this litigation revolves around insurance coverage questions and interpretations of policy exclusions, the Court begins by describing the underlying fatal automobile accident from

---

[1] All parties consented to having the undersigned Magistrate Judge preside over this case. [Docs. 3, 7, 9.]

which the issues arise.  The summary of the auto accident is taken from the Joint Status Report and pleadings and generally is undisputed.

On June 11, 2010, Eddy De La Paz ("De La Paz) was killed while driving a 2003 Lincoln Navigator ("Navigator").  De La Paz crossed the centerline of a state road in Lea County, New Mexico, and collided head-on with a vehicle driven by Roland Judson.  Judson died at the scene, and De La Paz died in the hospital a short time later.  De La Paz was determined to be responsible for the accident.  Toxicology studies showed that De La Paz tested positive for the presence of methamphetamines.  [Doc. 30, Ex. N.] On the date in question, the Navigator was titled in the name of Jimmie Cooper ("Cooper") or Sheryl Cooper, his wife.

When the accident occurred, De La Paz was an employee or salesman for Endeavor Services, Inc. ("Endeavor").  Endeavor was a start-up trucking company, that, among other things, hauled water to and from oil fields.  Endeavor is owned by Cooper's three adult children, along with Virgil Woods ("Woods").  Cooper financed most of Endeavor when it was started in early 2010, while his three children also put some money into the business.  Cooper loaned money to Woods for Woods' contribution to the business.  Cooper and his wife were listed as directors on Endeavor's corporation division certificate, and Cooper is listed as the registered agent of Endeavor.  Jimmie Cooper and his wife were not shareholders in Endeavor.

Endeavor needed a vehicle for De La Paz to conduct Endeavor's business.  Woods and Cooper spoke about this, and Cooper commented that he and his wife had a personal vehicle (the Navigator) that they did not use much.  Cooper suggested that Endeavor use the Navigator, and later, that Endeavor could buy the Navigator whenever it got sufficient finances.  Cooper allowed Endeavor to use the Navigator, beginning approximately several months before the accident occurred.  Cooper understood that Endeavor would continue to use the Navigator until Endeavor had

the funds to buy the vehicle from Cooper.  After providing the Navigator to Endeavor, the Coopers themselves never used the Navigator again or requested its return.  However, the Navigator was covered on the Coopers' ANPAC insurance policy and continued to be included on the Coopers' insurance coverage, even after Endeavor began using the Navigator.

The decision to allow Endeavor to use the Navigator stemmed from verbal discussions between Cooper and Woods that Cooper would be paid the fair market value of the Navigator when Endeavor could afford to buy it.  Cooper thought the fair market value of the 2003 Navigator might be $10,000 to $12,000, or less, but he did not know blue book value.  There was no written sales or conditional sales contract, and the price of the vehicle was undetermined.  Cooper testified that he may have jotted down some of the details of these communications on a piece of paper, but no such writing was produced.  At the time of the accident, Cooper did not expect to be paid for the vehicle until possibly a month to six months, or even a year later.  In other words, there was no set date for payment.

The Navigator was loaned to Endeavor.  There is no written agreement and no money exchanged hands for any kind of formal loan or purchase.  Endeavor paid for the gas it used in the Navigator.  Shortly after Endeavor began using the Navigator and before the accident, Cooper and Endeavor were in agreement that Endeavor would buy the Navigator at some undetermined time in the future.  No down payment was made, and no specific purchase price was determined. The Navigator remained titled, registered, and insured in the Coopers' name.

According to Woods, De La Paz was on the job or within the course and scope of his employment with Endeavor on the date of the accident.  De La Paz used the Navigator for Endeavor with Cooper's express permission, and De La Paz's use of the Navigator on the day of the collision was within the scope of Cooper's permission.  De La Paz had a commercial driver's license at the

time of the accident, and neither Woods nor Cooper had reason to believe De La Paz was using drugs on the date of the accident.

The Navigator was a total loss as a result of the collision.  The Coopers made a claim for property damage through their own ANPAC, and ANPAC paid out to the Coopers the value of the vehicle.  Endeavor never obtained separate insurance coverage for the vehicle; never paid insurance on it; never reimbursed Cooper for the insurance premiums; and never filed its own claim with its insurer for the vehicle's loss.

Following the accident, Judson's Estate sued the Estate of De La Paz and Endeavor for wrongful death.  The three insurers – ANPAC (Cooper's insurer), Great West (Endeavor's insurer), and United Speciality (Endeavor's excess insurer) – were notified of the claim.  Settlement negotiations proceeded, and settlement was reached in the amount of $1,650,000, payable to Judson's Estate.  Of that amount, Great West paid $1 million through its policy.  ANPAC, through its family auto and commercial umbrella policies, paid $650,000.   United Speciality states it engaged in settlement discussions with the other two insurers. [Doc. 32, ¶ 21.]  ANPAC contends that United Specialty failed to attend the settlement conference with settlement authority and refused to participate in settlement negotiations. [Doc. 41, ¶ 3(c).]

With respect to the underlying lawsuit and prior to the settlement, Plaintiff and Defendants entered into a non-waiver agreement. [Doc. 30, Ex. P.]  The insurers allegedly reserved the right to dispute or determine applicable insurance coverage at a later date.  ANPAC states that through the agreement, each insurer reserved the right to contest coverage obligations and reserved all claims for subrogation, indemnification, contribution, or otherwise.  ANPAC, through this litigation, contests its coverage obligations.

**Procedural History**

On December 27, 2011, ANPAC filed a Complaint for Declaratory Judgment and Equitable Subrogation against United Speciality and Great West ("complaint"). [Doc. 1.] In February 2012, United Specialty filed an initial Answer and subsequently, an Amended Answer to the complaint. [Doc. Nos. 12, 13.] United Speciality also asserted a counterclaim against ANPAC. [Doc. 13.] On March 8, 2012, ANPAC filed an answer to the amended counterclaim. [Doc. 18.] In February 2012, ANPAC and Great West stipulated to a dismissal of Great West [Doc. 14]; thus, Great West no longer is a party to this lawsuit, even though it paid its $1 million limit in the underlying settlement. *See* [Doc. 30, Ex. L, "Release in Full and Indemnity Agreement."]   A jury trial is scheduled for January 14, 2013.  [Doc. 27.]

In the Joint Status Report ("JSR"), the parties describe, *inter alia*, that this case involves a "claim for declaratory relief and equitable subrogation by one insurer against another insurer arising from a fatal automobile accident." [Doc. 15, at 1.] ANPAC states that it paid funds to settle a wrongful death claim under a non-waiver agreement with United Speciality.  ANPAC now seeks reimbursement from United Specialty for amounts paid to settle the claim. [Id.] United Specialty denies liability to ANPAC and seeks declaratory relief in its counterclaim that it owes nothing to ANPAC on the claims for equitable subrogation. [Id.] The parties agree that the governing law in this case is New Mexico state law. [Id., at 2.]

**Undisputed Material Facts Regarding Insurance Coverage/Exclusions**

***ANPAC Insurance Policies of the Coopers***

Cooper insured the Navigator under a family auto policy issued by ANPAC that was in effect at the pertinent time.  The Navigator was listed as an insured vehicle under the Coopers' ANPAC

policy, with bodily injury liability coverage limits at $500,000 per person/occurrence. [Doc. 30, Ex. D.]

The Cooper family auto policy with ANPAC promised to pay "damages for which an insured person becomes legally liable because of bodily injury . . . resulting from the ownership, maintenance or use of your insured car. . . ."   Included in the definition of "insured" person under this policy is "a person using your insured car if its use is with your express permission and within the scope of such permissions." [Id. Ex. D, at 3 (27).]

The family auto policy in question excluded from coverage any liability "while any insured vehicle is rented, leased, or subleased or under any purchase agreement or conditional sale to others."  The family auto policy, under the circumstances of the accident, provided coverage for up to $500,000 for any liability against De La Paz or Endeavor due to injuries or death sustained by Judson, unless the "conditional sales" exclusion or some other exclusion applied. [Id., Ex. D, "Exclusions," ¶ (16).]

At the time of the accident, Cooper also had in effect with ANPAC, a commercial liability umbrella policy with liability limits of $1 million ("commercial umbrella"). [Doc. 30, Ex. E.]  The commercial umbrella policy promised to pay "[t]hose sums that the insured becomes legally obligated to pay as damages because of bodily injury ... to which this insurance applies."   The commercial umbrella policy further provided that it --

> is excess over primary insurance, whether or not valid and collectible, or any other valid and collectible available to the insured, except insurance which is specifically purchased by the insured as excess insurance over the insurance provided by this policy.

An insured under the commercial policy was defined in part, as "[w]ith respect to the use by you or within the scope of your permission of any auto which you own or which is borrowed, hired

6

or leased by you or on your behalf: 1) any person while engaging in the use of such auto; and 2) any person or organization legally responsible for the use of such auto." [Id., Ex. E, Part VI, 2(e).]

The ANPAC commercial umbrella policy contained an exclusion for bodily injury "arising out of the use, sale . . . or possession by any person of a controlled substance." The policy does not define the term "controlled substance." [Id., Ex. E, Part III, ¶ 10.]

With respect to the underlying settlement paid to the deceased's estate, ANPAC paid $500,000 from its family auto policy and $150,000 from its commercial umbrella policy, *i.e.,* a total of $650,000 from two different policies.

### ***Great West Insurance Policies of Endeavor***

At the time of the accident, Endeavor was insured for auto liability under a Great West commercial auto policy with liability limits of $1 million. The Great West auto policy covered Endeavor for auto liability resulting from the use of a "covered auto." The Great West policy defines covered autos as "specifically owned autos," "hired autos," and "nonowned autos." [Doc. 30, Ex. J, § 1-"Covered Autos."]

"Specifically described autos" in the Great West policy are defined as those autos listed in the Declarations for which a premium is charged. [Id., Ex. J, § 1, ¶ 46.] The Navigator was not listed in the schedule of covered vehicles, nor was a premium charged for it by Great West. Thus, it does not qualify as a "specifically described auto" under Great West's policy.

"Nonowned autos" are defined as "[o]nly those 'autos' you do not own, lease, hire, rent, or borrow that are used in connection with your business. This includes 'private passenger type' 'autos' owned by your 'employees,' partners (if your are a partnership), members (if you are a limited liability company) or members of their household but only while used in your business." [Id., ¶ 48.]

7

"Hired autos" are defined as "[o]nly those 'autos' you lease, hire, rent or borrow.  This does not include any 'private passenger type' 'auto' you lease, hire, rent or borrow from any member of your household, any of your 'employees,' partners . . . or agents or members of their households." [Id., ¶ 47.]

The Great West policy states it will "pay all sums an 'insured' must pay as damages because of 'bodily injury' or 'property damage' to which the insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" [Id., § II "Liability Coverage."]

### *United Specialty Insurance Policies of Endeavor*

United Specialty issued Endeavor an excess liability policy which was in effect on the date of loss, with liability limits of $1 million.  With respect to "coverage," the policy provides:

> This insurance [United Specialty] only applies to injury or damage covered by the underlying insurance, and that takes place during our policy period.  We will pay on your behalf the ultimate net loss in excess of the applicable limits of the underlying insurance listed in the attached schedule of underlying insurance (whether such insurance is collectible or not).

[Doc. 30, Ex. K, "Excess Liability Policy," § 1 ("Insuring Agreement").]  The United Specialty policy identifies Great West as the underlying insurance. [Doc. 30, Ex. K, "Declarations Excess Liability Policy" and "Schedule of Underlying Insurance."]

United Specialty contends that ANPAC cannot demonstrate that Great West's policy provided coverage.  Thus, according to United Specialty, it follows that if Great West was not responsible for the primary and underlying insurance coverage, United Speciality's excess policy is not triggered under any circumstance.

The United Speciality excess policy also contains an "other insurance clause" which states:

> If other insurance, whether collectible or not, is a available to the insured covering a loss also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and shall not contribute with such other insurance.

[Id., § III, ¶ J.] "Other insurance" is defined as insurance other than the underlying insurance which was provided to the insured. [Doc. 30, § III, ¶ D.]

United Speciality's policy did not pay any sum towards the underlying settlement.

## Summary Judgment Standard

Summary judgment is not a "disfavored procedural shortcut."  Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law.  Celotex Corp., 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), cert. denied, 537 U.S. 816 (2002).  Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.

9

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P. 56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  Mitchell v. City of Moore, Okla., 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

Here, where the parties have filed cross motions for summary judgment, "[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."  James Barlow Family Ltd. Partnership v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997), cert. denied, 523 U.S. 1048 (1988).  Therefore, the legal standard remains the same – each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.  Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).  In other words, cross motions are evaluated independently.  The denial of one does not require the grant of another.  US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324 (10th Cir. 2010) (quotation and ellipsis omitted).

## Analysis

## I.    CROSS MOTIONS FOR SUMMARY JUDGMENT [Docs. 29, 32]

As stated above, ANPAC seeks summary judgment on its complaint for declaratory judgment that liability coverage under ANPAC policies is not triggered by the June 11, 2010 accident.  ANPAC's argues that United Speciality must reimburse ANPAC for the additional $650,000 that ANPAC paid in the underlying settlement.

ANPAC provided several insurance policies to the Coopers during the pertinent period, *e.g.,* Family Auto Policy (30-A743-04C-3) ("family auto policy"); Commercial Liability Umbrella Policy (3001E0016) ("commercial umbrella"); Commercial General Liability Policy (3001L0014) ("GCL policy"); Business Automobile Policy (3001C0267-01) ("business auto policy"); and Farm Umbrella Policy (3001B0063) (farm umbrella policy), some of which were described above.  In its brief, ANPAC argues that there is no coverage under the GCL policy and Special Farm Package "10", business auto policy, and farm umbrella policy. [Doc. 29, at 7-9, 14.]

United Speciality does not dispute that ANPAC issued a number of insurance policies to the Coopers and that certain policies are immaterial to the coverage issues at hand, including ANPAC's CGL policy, special farm package number 10 policy, business auto policy, and farm umbrella policy. [Doc. 33, at 13-14.] Thus, the Court does not analyze those policies and exclusions.

United Speciality's motion for summary judgment seeks, in part, declaratory judgment in its favor that the coverage exclusions under the ANPAC's family auto and commercial umbrella policies are not applicable and that both ANPAC policies provide coverage rather than United Speciality's excess policy.  United Speciality also asks that the claims of ANPAC for equitable subrogation against United Speciality be dismissed, with prejudice. [Docs. 32, 43.]

The primary material issues in dispute (as discussed *infra*) involve interpretations of ANPAC's family auto policy and its commercial umbrella policy and their exlusionary clauses. After deciding those issues, the Court examines questions relating to Great West's coverage of the underlying settlement.

### A.     *ANPAC's Family Auto Policy–Conditional Sale Exclusion*

ANPAC asserts that under the Coopers' family auto policy there is no coverage for Endeavor employee De La Paz based on the exclusion relating to a "conditional sale." [Doc. 29, at 9-10.]

ANPAC relies on the provision in that policy that excludes coverage for an insured vehicle that is "under . . . conditional sale to others."

According to ANPAC, Cooper allowed Endeavor and De La Paz to use the Navigator "pursuant to a conditional sale agreement."   ANPAC further contends that prior to the accident Cooper and Endeavor had agreed that Endeavor would purchase the Navigator from Cooper and that Endeavor would pay "blue book" fair market value for the Navigator after Endeavor had the financial capacity to do so.   [Doc. 29, UMF Nos. 5-7.] Thus, ANPAC contends that these agreements arise to a "conditional sale," thereby triggering the pertinent policy exclusion.

The Court disagrees that the undisputed material evidence supports ANPAC's conclusion. ANPAC first argues that even though its family auto policy does not define the phrase "conditional sale," [Doc. 29, at 10], this type of exclusion is "unambiguous and enforceable." [Doc. 29, at 9.] In support of its position, ANPAC relies on an overruled state law decision from the Indiana Court of Appeals, Stoffel v. United Farm Family Mut. Ins. Co., 900 N.E.2d 828 (Table, Text in Westlaw), 2009 WL 104178, at *1 (Ind. App. Jan. 16, 2009) (unpublished).   The case is no longer good law in Indiana.   Moreover, a number of the facts are distinguishable, including that the court in Stoffel refers to an actual written contract (e.g., the automobile was sold "on contract").

In this case, the Court concludes that the phrase "conditional sale" is undefined and ambiguous.   As noted by the New Mexico Supreme Court in Phoenix Indem. Ins. Co. v. Pulis, 129 N.M. 395, 402 (2000), "[w]hen there is ambiguity [in an insurance contract] ... the test is not what the insurer intended its words to mean, but what a reasonable person in the insured's position would have understood them to mean."  (citations omitted).  "The insurer bears the sole burden of issuing an intelligible policy. . . . 'If the insurer issues an ambiguous policy, the ambiguities are construed

against the insurer.'" Id. (internal citations omitted).  Moreover, the Court does not find persuasive ANPAC's reliance on definitions for other sources as to a "conditional sale."

Here, in reference to the Navigator, the following facts are undisputed: (1) the parties did not execute a written purchase or sales agreement of any type; (2) the parties did not document in writing any verbal agreement as to the Navigator; (3) the parties did not agree to any specific terms of purchase or sale, *e.g.,* they did not agree to a specific sales price and they did not know the monetary worth of the vehicle when Endeavor used the Navigator; (4) the parties did not designate any terms of conditions of a sales agreement that were to occur at any specific time; (5) title to the Navigator remained in Cooper's name and was not scheduled to be transferred to Endeavor on any specific date; (6) there were no changes in registration or insurance of the Navigator, *i.e,* the Navigator's registration and title remained in Cooper's name and the Navigator continued to be listed under Cooper's family auto insurance policy; (7) Cooper continued to pay premiums under the ANPAC policy for the Navigator; (8) Endeavor made no down payment to Cooper for the Navigator; (9) Endeavor made no monthly payments to Cooper for use of the Navigator; (10) Endeavor made no contributions towards insurance of the Navigator; and (11) while Cooper and Endeavor discussed that Endeavor some day would pay for the Navigator, there was no time line for that payment.  Such indefiniteness of terms, including price, payment, performance, and risk of loss, does not support the existence of an enforceable contract or agreement.

While Endeavor possessed and used the Navigator for a few months and paid for gas its employee used driving the vehicle, these facts alone do not suggest that a "conditional sale" occurred, particularly when construing ambiguous insurance policy terms against the insured. Perhaps most telling of all is that when the Navigator was declared a total loss in the June 2011 accident, Endeavor did not submit a claim for property damage to the Navigator, indicating an intent

13

on its part to be bound by a "conditional sale" agreement.  The uncontested facts are that Cooper made the sole claim for damages to the Navigator and received payment on the claim from ANPAC. Clearly, under these circumstances, neither Endeavor nor Cooper evidenced any belief that there was an enforceable contract of sale.  No change in legal status of the Navigator occurred as a result of Endeavor's short-term use of the Navigator.

At most, the communications between Cooper and Woods amounted to an expression of a *plan* for Endeavor to purchase the vehicle at some undefined time and for an unstated sales price, rather than a contractual agreement.  Under New Mexico contract law, indefiniteness of terms can defeat a contract claim.  *See, e.g.,* Padilla v. RRA, Inc., 124 N.M. 111, 114 (Ct. App. 1997) (noting that indefiniteness may "strongly indicate" the absence of a bargain, depending on the circumstances).  In Padilla, the state court instructed that enforceability of a contract requires more than the parties' intent to be bound.  Id.  Instead, the terms of a contract must be reasonably certain if they are to provide a basis for determining the existence of a breach and the opportunity for deciding on an appropriate remedy.  Under the circumstances of this case, the uncertainness of ***all*** possible terms fails to evidence a "conditional" sale or any sale at all.  *Compare* Phillips v. Providence Washington Ins. Co., 298 S.W.2d 181 (Tex.Civ.App. 1957) (exclusion provision of auto sold under a conditional sale applied on coverage claim where the customer entered into an agreement to purchase the car and made a down payment).  Thus, based on the undisputed material facts, the exclusionary language on which ANPAC relies to escape coverage, is inapplicable.  There simply was no conditional sale.  The Court concludes that the undisputed material facts support a finding that ANPAC properly paid its limit of $500,000 under the Coopers' family auto policy.

**B.      *ANPAC's Commercial Liability Umbrella Policy and Exclusion*:**

ANPAC argues that its commercial umbrella policy, which contributed $150,000 from its excess coverage amounts to the $650,000 settlement, did not provide coverage for the loss at issue. United Specialty asserts that ANPAC properly paid the settlement sums.

### 1.      <u>Who is an insured?</u>

ANPAC first asserts that there is no coverage under the commercial umbrella policy because the Navigator was not being used in a business owned by Cooper.  This argument is based on definitions in the commercial umbrella policy of "who is an insured." [Doc. 29, at 11.] The definition states, in part, that the policy covers "an individual, you and your spouse" "but only with respect to the conduct of a business of which you are the sole owners."  ANPAC contends that, at the time of the accident, while the Navigator was being used by Endeavor, Cooper was neither sole owner nor an owner of Endeavor.

ANPAC acknowledges, however, additional language in its commercial umbrella policy stating that each of the following is an insured "with respect to the use by you or within the scope of your permission of any auto which you own or which is borrowed" – 1) any person while engaging in the use of such auto; and 2) any person or organization legally responsible for the use of such auto." [Doc. 29, at 11] (*citing* Ex. E, commercial umbrella policy, Part VI(1)(a) & (2)(e)).

ANPAC claims this second part of the definition of "who is an insured" should not apply to provide coverage under these circumstances, because to do so, would lead to an "illogical" and "meaningless" result.  ANPAC further argues that the parties intended the commercial umbrella policy  to provide coverage only in relation to Cooper's own business(es), not some other business like Endeavor.

The Court disagrees.  The language here is unambiguous with respect to who an insured is under the commercial umbrella policy.  It can be "any person" using the auto at issue who was using it within the scope of Cooper's permission.  ANPAC does not dispute, nor could it, that De La Paz or Endeavor were using the Navigator with Cooper's permission and that the vehicle's use was within the scope of the permission.  Thus, there are no genuine issues of material fact with respect to this argument or policy provision concerning the definition of "who is an insured."

### 2. *"Arising out of" use of controlled substance exclusion*

ANPAC's second argument that the commercial umbrella policy does not apply is premised on an exclusionary clause for "bodily injury arising out of the use, . . . or possession by any person of a controlled substance."  ANPAC asserts that courts have not hesitated to apply the controlled substance exclusion "where a controlled substance has led to bodily injury," thereby precluding coverage.  [Doc. 29, at 13.]

United Speciality states that the undisputed material facts concerning this argument are that the accident occurred about 50 miles into De La Paz's trip.  It appears from the undisputed facts that De La Paz operated the vehicle, without accident, for some length of time, or at least from 25 to 50 miles.  United Speciality argues that under these circumstances, the Court cannot rule out other contributing causes for the accident.  For example, United Specialty posits that immediately prior to the accident, De La Paz's attention could have been diverted for reasons other than his drug use.

### 3. *Pertinent Legal Standard*

There are no New Mexico cases on point.  ANPAC supports its position with a number of out-of-state court decisions.

"The interpretation of an insurance contract is a matter of law about which the court has the final word." Rummel v. Lexington Ins. Co., 1997–NMSC–041, ¶ 60, 123 N.M. 752.  The court

resolves "questions regarding insurance policies by interpreting their terms and provisions in accordance with the same principles which govern the interpretations of all contracts." Molina v. Allstate Indem. Co., 149 N.M. 180, 182 (Ct. App.) (internal citations omitted), *cert. denied*, 150 N.M. 492 (2010).

The general rule is that "any uncertainties in a contract must be construed most strongly against the party who drafted it." Manuel Lujan Ins., Inc. v. Jordan, 100 N.M. 573, 576 (1983). *See, e.g.,* Keckler v. Meridian Sec. Ins. Co., 967 N.E.2d 18, 22[2] (Ind.Ct.App. 2012) (if there is ambiguity in a policy, the court strictly construes it against the insurer; this is particularly true where a policy attempts to exclude coverage); Legg v. Certain Underwriters at Lloyd's of London, 18 S.W.3d 379, 385-86 (W.D.Mo. 1979) (noting that in Missouri, a circumstance must be the proximate cause of injury in order to be validly excluded from coverage under an insurance policy, not just a contributing cause; finding that the phrase "loss caused by or resulting from" was "simply ambiguous and as such, must be strictly construed against the insurer;" further noting that the phrase, as written, was "at best ambiguous in that a number of situations could arise that would bar recovery").

An insurance policy is not ambiguous merely because a term is undefined; instead, the term must be interpreted in its usual, ordinary, and popular sense." Battishill v. Farmers Alliance Ins. Co., 139 N.M. 24, 26 (2006). However, "a court may find that an ambiguity exists if separate sections of the policy conflict, if the language may have more than one meaning, if the structure of the

---

[2]The Court recognizes that the Indiana Court of Appeals decision is not binding on this Court. However, where there is no case law in New Mexico interpreting a similar policy exclusion, the Court finds Keckler instructive, as the facts and policy exclusion language are similar to the present case.

contract is not logical, or if a relevant matter of coverage is not explicitly addressed in the policy. Rummel, 1997–NMSC–041, ¶ 19 (internal citation omitted).

Moreover, the insurer bears the burden of proof to establish the application of an exclusion to coverage.  *See* Battishill, 139 N.M. at 25.  *See also* 1 Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman on Insurance, § 1.10, at 43 (2d ed.1996); Couch on Insurance 3d, § 254.12 (general rule is that insurer bears burden of showing applicability of an exclusion)).  Additionally, exclusionary language should be strictly construed against the insurer.  *See* Knowles v. United Servs. Auto. Ass'n, 113 N.M. 703, 705 (1992) (noting general rule in New Mexico that exclusionary clauses in insurance policies are to be narrowly construed).  *See also* Bird v. State Farm Mut. Auto. Ins. Co., 142 N.M. 346, 350 (Ct. App.) ("The reasonable expectations doctrine [recognized in New Mexico] has been said to be consistent with the rule that ambiguous language in an insurance policy is to be liberally[.]") (internal citations omitted), *cert. denied*, 142 N.M. 329 (2007).  Indeed, "[i]t is the obligation of the insurer to draft an exclusion that clearly and unambiguously excludes coverage."  Computer Corner, Inc. v. Fireman's Fund Ins. Co., 2002–NMCA–054, ¶ 7, 132 N.M. 264, *cert. denied*, 132 N.M. 288 (2002). Where it is determined that certain language in an insurance policy or exclusion is ambiguous, it "is the law in New Mexico that 'an insurance policy which may reasonably be construed in more than one way should be construed liberally in favor of the insured.'"  Erwin v. United Benefit Life Ins. Co., 70 N.M. 138, 144 (1962).

### 4.    *Discussion*

The phrase at issue in the exclusionary clause of ANPAC's commercial umbrella policy is "arising out of" and is undefined in the policy.  The policy exclusion does not cover bodily injury "arising out of the use . . . of any person of a controlled substance."  Here, it is undisputed that De

18

La Paz was using a controlled substance and that laboratory testing after the accident confirmed he had significant amounts of methamphetamine in his system. [Doc. 30, Ex. N; Doc. 32, at 15.]   The dispute is whether the accident arose out of De La Paz's use of methamphetamines.

ANPAC relies on its expert's opinion.  Dr. Richard Morrisett, PhD., concluded that De La Luz's blood level of methamphetamine was "quite high" and in the "toxic range for a number of serious adverse neurological, behavioral and somatic effects," *e.g.,* stroke, seizures, brain damage, and sudden cardiac death. [Doc. 30, Ex. O, at 77 of 81.]  According to Dr. Morrisett, De La Paz "ingested a toxic amount of methamphetamine which rendered him incapable of safe operation of a motor vehicle . . . ."  Dr. Morrisett, therefore, inferred that De La Paz's "methamphetamine intake substantially contributed to the motor vehicle accident . . . ." [Id.]

In support of its position that the exclusion precludes coverage, ANPAC cites New Mexico case law interpreting the phrase "arising out of" as "very broad, general comprehensive terms, ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or flowing from' . . . ." [Doc. 29, at 13.] Based on the broad definition of "arising out of" and the inference Dr. Morrisett made that De La Paz's methamphetamine use "substantially contributed" to the fatal accident, ANPAC argues the exclusion applies to preclude coverage for the payment of $150,000 under the commercial umbrella policy.

United Speciality argues that the phrase "arising out of" is so ambiguous as to make the exclusion unenforceable.  It is unclear, according to United Specialty, whether the use of the controlled substance sufficient to trigger the exclusion, had to be "a cause," "a substantial cause," or the "sole cause" of the accident. [Doc. 33, at 18.] United Speciality asserts that without a factual determination as to the cause of the accident and without "clearly conclusive evidence" that De La

Paz's methamphetamine use was the cause of the accident, it is impossible to know the level of proof necessary to meet the terms of the exclusion.

The Court does not necessarily agree that ANPAC had to present evidence that De La Paz's methamphetamine use in relation to the accident was "the sole cause" of the accident.  However, the problem is that the phrase "arising out of," even in its broadest interpretation does not answer the question of whether De La Paz's use of methamphetamine caused the accident, in part, in whole, or at all.

The Court further observes that it is not uncommon to have an accident where an intoxicated driver may be traveling within his lane at a safe speed and another driver may run a light or stop sign causing the crash.  In those instances, the driver's intoxication did not cause the accident.  *See, e.g.,* Finney v. Machiz, 463 S.E.2d 60, 61 (Ga. App. 1995) (driver's alleged negligence in driving under the influence of alcohol and cocaine was not actionable because other evidence established that this negligence played no causative role in collision; sole proximate cause of accident was an intervening act of another driver's car that skidded into vehicle); Carey v. Thomas*,* 603 So.2d 263, 266 (La.App. 5 Cir. 1992) (affirming jury's finding that while driver was intoxicated, the cause of the accident resulted from driver having fallen asleep).  *See also* Legg, 18 S.W.3d 379 at 385-86 (if intoxication played only an indirect role in accident, insurance exclusionary clause might be viewed as ambiguous and unenforceable because it could bar recovery when cause of accident was no fault of intoxicated driver).

Here, De La Paz's methamphetamine use *might* have caused the accident.  But, it is also possible that De La Paz fell asleep at the wheel, was texting or talking on a cell phone, spilled a cup of hot coffee on his lap, was eating, took his eyes off the road while he reached down to pick up a

dropped item, or engaged in any number of distractions from driving that caused or contributed to the accident.

None of the relied upon cases convince the Court that ANPAC met its burden of demonstrating applicability of the exclusion. In those cases, there was no uncertainty as to causation because those facts were not in dispute.  For example, in <u>Westfield Nat'l Ins. Co. v. Long</u>, 811 N.E.2d 776 (2004), it was stipulated that the victim's death was caused by methamphetamine being placed in her drink.  In <u>Forman v. Penn</u>, 945 N.E.2d 717, 719 (Ind. App. 2011), it was uncontested that the injury arose out of an individual's use of methadone, thereby triggering the policy exclusion. In <u>Prudential Prop. & Cas. Co. v. Brenner</u>, 795 A.2d 286, 287 (N.J. 2002), a drug dealer was shot and killed when the perpetrators' "whole purpose" in going to the  dealer's home was to acquire marijuana.  Thus, the court found a "substantial nexus" between the drug dealer's death and the perpetrators' attempted purchase of a controlled substance.

The same facts are not present here.  Whether De La Paz's use of methamphetamine was a cause of the accident or contributed to the fatal crash is unknown.  Causation is disputed.  Even agreeing with ANPAC's definition that the phrase "arising out of" means "originating from," "having its origin in," "growing out of," or "flowing from," *see, e.g.,* <u>Baca v. New Mexico State Highway Dep't</u>, 82 N.M. 689, 692 (Ct. App.1971), the Court is not presented with undisputed material facts showing that Judson's death "arose out of, originated from, grew out of, or flowed from" De La Paz's drug use.  As stated, a number of other factors leading to De La Luz's inattentive and dangerous driving could have caused the collision, apart from or including De La Paz's methamphetamine use.  *Compare* <u>Servants of the Paraclete, Inc. v. Great Am. Ins. Co.</u>, 857 F.Supp. 822, 836-37 (D.N.M.) (holding that the injury " 'arose' out of the use of the premises" if there was

some causal connection or a sufficient nexus between the ownership, maintenance, or use of the premises and the injuries sustained), *amended in part,* 866 F.Supp. 1560 (D.N.M. 1994).

ANPAC did not use the words "caused," "contributory cause," or "caused by" in its exclusionary language[3] and elected, instead to use the phrase "arising out of," without defining those terms. However, the phrase "arising out of" still evokes questions of causation. And, the question remains unanswered as to whether there was a sufficient nexus between De La Luz's drug use while driving the Navigator and the injuries that were sustained, to trigger the policy exclusionary clause.

The Court concludes that the undisputed material facts support a finding that ANPAC failed to satisfy its burden in demonstrating applicability of the exclusion. In other words, ANPAC did not demonstrate that the accident and injuries "arose out of" De La Luz's use of methamphetamines. *See* Barga v. Indiana Farmers Mut. Ins. Group, Inc., 687 N.E.2d 575, 579 (Ind.Ct.App. 1997) (when there is more than one possible cause of an otherwise insurable injury, generally a fact issue exists as to what the predominant cause of injury was in order to determine if an injury "arose out of" specifically excluded activity). Thus, the Court will deny ANPAC's motion for summary judgment as to whether the substance abuse exclusion applies to avoid coverage.

With respect to United Speciality's motion for summary judgment, seeking a declaration that ANPAC's commercial umbrella policy applies to the claims in the underlying lawsuit and that ANPAC was correct in fronting the $150,000 under that policy for the underlying settlement, the

---

[3]"A term such as cause that has been the subject of great philosophical and legal debate, as well as contradictory dictionary definitions, may well mean different things to different people. A reasonable insured could have read defendant's insurance policy to exclude coverage when a blood alcohol level was 'a cause,' 'a substantial cause,' or only when it was 'the sole cause' of an injury. Because a reasonable insured may have understood 'cause' to mean any of these things, it is ambiguous as used in defendant's insurance policy." Smith v. Stonebridge Life Ins., 473 F.Supp.2d 903, 909-10 (W.D.Wis. 2007). Thus, the court would not correct insurer's drafting oversights. Id.

Court grants summary judgment.  This decision is based on the Court's conclusion that the language in ANPAC's commercial umbrella exclusionary clause, "arising out of" the use of a controlled substance, is ambiguous and unenforceable.  (*See* discussion *supra*, at pp. 18-22.)

The Court's reasoning is premised on the recognition that insurance companies may draft their contracts to identify and limit exposure to risks and they must do so explicitly.  *See, e.g.*, Garriguenc v. Love, 226 N.W.2d 414, 417 (Wisc. 1975).  *See also* Monsalud v. State Farm Mut. Auto. Ins. Co., 568 N.E.2d 969, 973 (Ill. App. 2 Dist.1991) (if insurer does not "explicitly state" limitation in policy, courts have duty to construe policy in favor of coverage and not to imply alleged limitation/exclusion). Here, ANPAC, as the drafter of the insurance policy and exclusionary clause had every opportunity to eliminate any ambiguity surrounding the meaning of the language of "arising out of" or questions of causation.  Because ANPAC failed to provide specific definitions in its policy and exclusions, it cannot look to this Court to correct what appears to be its own drafting oversight.  *See, e.g.,* Keckler v. Meridian Sec. Ins. Co., 967 N.E.2d 18, 22-23 (Ind. Ct. App. 2012) (exclusionary policy "must clearly and unmistakably bring within its scope the particular act or omission that will give rise to the exclusion in order to be effective, and coverage will not be excluded or destroyed by an exclusion or condition unless such clarity exists.") (citations omitted).

For all of the above-stated reasons, the Court denies, in part, ANPAC's motion for summary judgment concerning the application of the two exclusionary clauses in its policies.  Based on its reasoning, the Court grants United Speciality's motion for summary judgment with respect to its declaration that ANPAC cannot rely on the exclusionary provisions in its family auto and commercial umbrella policies to preclude coverage of the losses.  In other words, the two ANPAC insurance policies provide coverage for the losses and ANPAC properly paid $650,000 in the underlying settlement.

A different result might be reached depending on the Court's resolution of whether Great West, the underlying insurer, properly covered the loss and/or depending on the Court's interpretation of the "competing" "other insurance" clauses in the policies of both ANPAC and United Specialty.   The Court finds that it need not reach the issue of interpreting the "other insurance" clauses because, as explained below, it concludes that Great West was not obligated to provide coverage in the underlying settlement, even though it did.

### C.      *Great West's Coverage*

As noted above, the Great West auto policy covered Endeavor for auto liability resulting from the use of a "covered auto."  Great West's policy defines covered autos as "specifically owned autos," "hired autos," and "nonowned autos."  Those terms are further defined in the discussion below.  The pivotal question hinges on whether the undisputed material facts demonstrate that the Navigator was a "covered auto," meaning a "specifically owned auto," a "hired auto," or a "nonowned auto" under the Great West policy.

United Speciality argues in its response [Doc. 33, at 6] that for ANPAC to prevail on its claim that United Speciality should reimburse ANPAC for the $650,000 it paid in settlement, ANPAC must prove, *inter alia,* the Great West policy properly covered the loss at issue.  United Speciality contends that it is undisputed that Great West was not the primary insurer and did not cover the loss.  In other words, United Speciality asserts that even though Great West made payment on behalf of Endeavor and De La Paz to settle the underlying lawsuit, Great West had no legal obligation to cover the loss.

ANPAC argues to the contrary, claiming that there was coverage for De La Paz as a permissive driver of the Navigator under Great West's policy definitions of a "nonowned auto" or a "hired auto."  [Doc. 29, at 15-17.] There are no genuine issues of material fact that De La Paz was

24

a "permissive driver" and that he was using the Navigator in connection with Endeavor's business. The Court first rejects ANPAC's position that the Navigator meets the Great West policy definition of a "nonowned auto."  Paragraph 48 of Great West's policy defines a "nonowned auto," in part, as "those 'autos' you **do not** own, lease hire, rent or **borrow** that are used in connection with your business." (emphasis added).

Here, the undisputed facts demonstrate that the Navigator was a "borrowed" vehicle and, therefore, not a "nonowned auto," as defined in the Great West policy.  Stated differently, the Great West policy language covers those nonowned vehicles that are **not** borrowed.  In its reply brief, ANPAC omits any further argument that the Navigator was a "nonowned" auto and appears to have abandoned that position.

But, ANPAC continues to argue that the Navigator fits the definition of a "hired auto," as defined in the Great West policy.  The Court rejects this position as well.  Paragraph 47 of the Great West policy defines a "hired auto" as those autos that Endeavor, for example, leases, hires, rents, or borrows.  The undisputed material facts demonstrate that Endeavor did not lease, hire, or rent the Navigator, as Endeavor paid no money to Cooper for the use of the SUV.  However, as noted above, the Court concludes that the undisputed facts show that the Navigator was a borrowed vehicle.

For example, it is uncontested that Cooper told Woods that he had an extra vehicle and that he offered that vehicle for Endeavor's use for an undefined length of time.  No money exchanged hands between Cooper and Endeavor for the use of the Navigator at any time; the parties did not enter into any type of written contract.  The common sense interpretation of what occurred is that Endeavor borrowed the Navigator from Cooper to use in its business.

ANPAC agrees that the vehicle was a borrowed car for purposes of this Great West policy definition and disagrees with United Speciality's position that the Navigator could not have been

25

borrowed since Endeavor had no intention to return the vehicle. ANPAC asserts that in this case, Endeavor intended to return the equivalent of the Navigator to Cooper at some point, in terms of "blue book" value when Endeavor became financially capable of making that payment.

While the Court agrees with ANPAC that the vehicle was borrowed, that does not end the inquiry of whether the Navigator meets the Great West policy definition of a "hired auto." The Great West policy provides a second line further limiting the definition of "hired autos":

> This ***does not include*** any 'private passenger type' 'autos' you lease, hire, rent or borrow from any member of your household, any of your 'employees,' partners (if you are a limited liability company) ***or agents,*** or members of their households.

[Doc. 30, Ex. J, § II(A)(1), ¶ 47] (emphasis added). Here, it is undisputed that Cooper, from whom Endeavor borrowed the Navigator, was the "agent" of Endeavor. Cooper is specifically identified as the "agent" on the record of "Corporation Detail" for Endeavor Services, that includes the corporation's status, date of incorporation, state of corporation, mailing address, director, officers and certificate of incorporation. [Doc. 32, Ex. B, Dep. Ex. 1.] Cooper also testified that he was the registered agent for Endeavor. [Doc. 32, Ex. B, Cooper Dep., at Tr. 8.] According to the specific policy language, *i.e.,* "hired autos," Great West does not cover liability for a vehicle that is borrowed from an agent.

In sum, the Court finds that the undisputed material facts show that Endeavor borrowed the Navigator, a private passenger type vehicle from Cooper, the registered agent for Endeavor. Thus, pursuant to the Great West policy language, the Navigator does not qualify as a "nonowned auto" or a "hired auto." Notwithstanding Great West's payment of the underlying settlement, it was not legally obligated to cover the loss under the pertinent policy provisions.

United Speciality provided undisputed material facts that its insurance policy was in excess to the underlying insurance policy of Great West. The United Speciality excess policy stated that it "applies to injury or damage covered by the underlying insurance . . ." The United Speciality policy then identified Great West as the underlying insurer. [Doc. 33-2, Ex. F.] The Court finds it is undisputed that the United Speciality excess policy only provided coverage if it was determined that the underlying insurer, Great West, covered the loss. This, the Court did not so do. As a result, United Speciality's excess liability policy does not come into play under any set of circumstances, and the Court finds it unnecessary to analyze the "competing" "other insurance" clauses in the policies of United Speciality and ANPAC.

## II.   <u>CONCLUSION</u>

The Court denies ANPAC's motion for summary judgment and further denies ANPAC's request that United Speciality pay costs or interest. The Court grants United Speciality's motion for summary judgment [Doc. 32] and its request that the Court enter an order declaring that: (1) the ANPAC family auto policy supplies coverage of the loss in question; (2) ANPAC's family auto exclusionary clause relating to "conditional sales" is inapplicable and does not preclude ANPAC's coverage under this policy; (3) ANPAC's commercial umbrella policy supplies coverage of the loss in question; (4) ANPAC's commercial umbrella exclusionary clause relating to use of a controlled substances is inapplicable and does not preclude ANPAC's coverage under this policy; (5) that the Great West policy does not apply even though it paid for the majority of the underlying settlement; (6) because the Great West policy does not apply to cover the loss, United Specialty's excess policy is not triggered for any coverage of the loss; and (7) the claims of ANPAC for equitable subrogation, etc. against United Speciality are dismissed, with prejudice.

IT IS THEREFORE ORDERED that summary judgment is denied to ANPAC, with the result that its complaint is dismissed with prejudice.  The Court grants summary judgment in favor of United Speciality, thereby granting the relief requested in its counterclaim, consistent with this Court's decision.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge